```
                                                    U.S. DISTRICT COURT
                                                    DISTRICT OF VERMONT
                                                          FILED

        UNITED STATES DISTRICT COURT          2025 MAR 31  AM 10: 09
               FOR THE
          DISTRICT OF VERMONT                        CLERK
                                               BY_____
JENNIFER DEAN,                    )                 DEPUTY CLERK
                                  )
        Plaintiff,                )
                                  )
    v.                            )            Case No. 5:22-cv-225
                                  )
TOWN OF HARTFORD, VERMONT and     )
BRETT MAYFIELD, in his individual )
capacity,                         )
                                  )
        Defendants.               )
```

## AMENDED OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 57, 91, 92)

Plaintiff Jennifer Dean claims that her rights were violated in May 2022 when Defendant Brett Mayfield conducted a rental housing inspection and issued an Emergency Health Order at the residential property where she was a tenant in the Town of Hartford, Vermont. (*See* Doc. 1.) She seeks compensatory and punitive damages as relief. (*Id.* ¶¶ 51–52.) Ms. Dean has withdrawn one of her claims, and the court dismissed some of her other claims in an Order dated September 19, 2023. (Doc. 17.)

Two of the remaining claims allege violations of the federal and state constitutional provisions regarding procedural due process (Count I) and unlawful seizure (Count II); Plaintiff invokes 42 U.S.C. § 1983 insofar as these claims allege deprivation of rights under the U.S. Constitution. The third remaining claim is for violation of tenant rights under 18 V.S.A. § 122 (Count III). The remaining defendants—the Town of Hartford (the "Town") and Town Health Officer Brett Mayfield—have separately moved for summary judgment. (Docs. 57, 92.) Ms. Dean has also moved for partial summary judgment on Count I. (Doc. 91.) The court heard argument on the motions on January 6, 2025.

## Background

The following facts are drawn primarily from the Rule 56 statements accompanying all three summary judgment motions and are undisputed except where noted.[1]  Additional facts are set forth as necessary in the analysis below.

Before May 27, 2022, Ms. Dean resided in the basement of the single-family residence located at 102 Jericho Street in Hartford, Vermont.[2]  (Doc. 57-3 at 2–3.)  John Patterson owned the house at all relevant times before his death on April 25, 2022, at which time ownership passed to his estate.  (Doc. 57-2 ¶ 1; 92-2 ¶¶ 30, 40; Doc. 97 ¶ 5.[3])  At all relevant times, Brett Mayfield was the local health officer for the Town of Hartford, Vermont.  (*See* Doc. 1 ¶ 3; Doc. 18 ¶ 3; Doc. 27 ¶ 3.)

On Friday, May 27, 2022, Mr. Mayfield conducted a rental housing inspection of the 102 Jericho Street property.  (Doc. 57-2 ¶ 3; Doc. 92-2 ¶ 43; Doc. 97 ¶ 19.[4])  The inspection took

---

[1] For purposes of this Background section, the cited portions of each party's Rule 56 statement—Doc. 57-2 (the Town); Doc. 92-2 (Mr. Mayfield), and Doc. 97 (Ms. Dean)—are undisputed unless otherwise noted.  Plaintiff's opposition to Mr. Mayfield's Rule 56 statement is divided into two sections: one listing factual assertions that Plaintiff believes are immaterial, and one listing factual assertions that Plaintiff contends are disputed or misleading.  (Doc. 105-1 at 1, 13.)  Unless otherwise noted, neither section includes objections to the facts set forth in this Background section.  Both Defendants have filed oppositions to Plaintiff's Rule 56 statement.  (Docs. 107, 109.)

[2] Ms. Dean testified that the address was in White River Junction, Vermont.  (Doc. 57-3 at 2.)  The unincorporated village of White River Junction is within the Town of Hartford, Vermont.  24 V.S.A. App. Ch. 123A, § 101.

[3] Defendants' Rule 56 statements opposing Plaintiff's motion seeks to dispute some of the assertions about the ownership of the house, Ms. Dean's rental arrangement (or lack thereof), or the intent of the estate after Mr. Patterson died.  (Doc. 107 ¶ 5; Doc. 109 ¶ 5.)

[4] In its Rule 56 statement opposing Plaintiff's motion, the Town asserts that the evidence Plaintiff cited in support of ¶ 19 "does not support the propounded statement of fact."  (Doc. 107 at 10.)  The cited evidence includes Mr. Mayfield's testimony that he prepared a rental housing inspection report for the 102 Jericho Street property on May 27, 2022.  (Doc. 91-6 at 45.)

place at the request of Michael Swett, acting on behalf of the estate.  (Doc. 66-16 at 9.)  Mr.

Swett accompanied Mr. Mayfield on the inspection.  (*Id.* at 8.)  Ms. Dean was not present during

the inspection.  (Doc. 92-2 ¶ 45.)

Mr. Mayfield also prepared a report (Doc. 57-4 at 14–27) of his inspection listing code

violations including: no smoke alarms or carbon monoxide alarms, only a single egress from the

basement, lack of handrails in basement stairway, lack of ventilation in the downstairs bathroom,

unsafe electrical wiring, and an open wall in the basement.  (Doc. 57-2 ¶ 4; Doc. 92-2 ¶ 52;

Doc. 97 ¶ 29.)[5]  Ms. Dean does not dispute the fact that the report lists code violations, but she

testified that there was a smoke alarm in her room (Doc. 114-2 at 11), and she notes that other

evidence indicates that there were handrails for the basement stairs (*see* Doc. 91-8 at 22–23;

Doc. 91-16 at 20).

Mr. Mayfield issued an Emergency Health Order ("EHO") dated May 27, 2022, and

addressed to the Estate of John Patterson, listing an email address with the username

"Lisamarancyswett."  (Doc. 57-5 at 5–6.)  The EHO stated that it was issued after inspection "by

the Health Officer, Deputy Health Officer and Fire Marshal."  (*Id.* at 5.)  Citing provisions of

Vermont's Rental Housing Health Code (RHHC), Vt. Admin. Code 12-5-25, and the National

Fire Protection Association (NFPA) code, the EHO listed multiple violations, including lack of a

fire extinguisher and smoke alarms, potentially nonconforming windows, unsafe electrical wiring

and open walls, and lack of a fan in the downstairs bathroom.  The EHO further stated that a pool

at the property contained "polluted water" and mosquito eggs, which caused a risk of mosquito-

---

[5] Mr. Mayfield also took photographs of the interior of the dwelling during his inspection.
(*See* Doc. 92-9.)

borne disease at nearby properties, including an abutting public elementary school. (Doc. 57-5 at 5.)

The EHO concluded that the property was a "public health hazard"; "unsafe and unlivable in its present condition"; and the cause of a "Public Health Hazard to [the] abutting school." (*Id.* at 6.) The EHO further stated: "Therefore, by the authority granted me by title 18, V.S.A. Sections 107, 127 and 602a[,] [i]t is hereby [ordered]: [t]hat within 2 hours Unit must be vacated and treatment of unit pool must take place" and that "Unit is to be closed to living there and cannot be occupied till inspected and approved by the Health Officer." (*Id.*) Mr. Mayfield and the Town admit that the written EHO did not contain any narrative regarding Ms. Dean's (or anyone's) rights to challenge, request a hearing about, or appeal the EHO; it also did not contain a narrative about Ms. Dean's rights as a tenant or the property owner's duties to her. (*See* Doc. 1 ¶ 28; Doc. 18 ¶ 28; Doc. 27 ¶ 28.)

Mr. Mayfield hand-delivered the EHO to Mr. Swett while at the house. (Doc. 57-2 ¶ 7.) Mr. Mayfield testified that he also posted the EHO on the door of the house. (Doc. 57-5 at 3.)[6] Plaintiff first saw the EHO when she returned home from work around 7:00 p.m. (Doc. 97 ¶ 42.) She also found that the locks to the property were changed. (Doc. 57-2 ¶ 9; Doc. 92-2 ¶ 72; Doc. 97 ¶ 46.) May 27, 2022, was the last day that she resided at 102 Jericho Street. (Doc. 66-2 at 22.)

---

[6] Mr. Mayfield further testified that he also posted his inspection report and a note with his contact information. (*Id.*) Ms. Dean asserts that she did not receive the inspection report and that "therefore it can be inferred that it was not actually posted to the door despite Mayfield's testimony." (Doc. 114 at 4.) The court notes that the Town Health Officer Manual states that THOs must provide a copy of the inspection report to tenants "in a timely fashion." (Doc. 66-15 at 25.) Insofar as the court should infer that Mr. Mayfield failed to do so, that does not alter the court's conclusions here.

The record includes another EHO indicating that Mr. Mayfield re-inspected the pool at the Jericho Street property on June 23, 2022. (Doc. 66-28.) Like the earlier EHO, this order found the Jericho Street property to be "not safe for habitation." (*Id.* at 1.) The record also includes a third EHO for the Jericho Street property, dated July 28, 2022, similarly finding the property to be "not safe for habitation." (Doc. 66-29 at 1.)

## Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [his] favor." *Edwards v. Arocho*, 125 F.4th 336, 346 (2d Cir. 2024) (final alteration in original; quoting *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023)). On cross-motions for summary judgment, the court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Williams v. MTA Bus Co.*, 44 F.4th 115, 125 (2d Cir. 2022) (alteration in original; quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). Where, as here, a defendant seeks summary judgment based on the qualified-immunity defense, "the defendant[] bear[s] the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Vasquez v. Maloney*, 990 F.3d 232, 238 n.5 (2d Cir. 2021) (quoting *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)).

## Analysis

### I.     The Town's Motion for Summary Judgment (Doc. 57)

The Town seeks summary judgment as to all three counts, arguing that it cannot be liable under 42 U.S.C. § 1983 (Counts I and II) or under 18 V.S.A. § 122(a) (Count III).  The court begins with § 1983 claims against the Town.

#### A.     Section 1983 Claims Against the Town

The Town raises two arguments for summary judgment on the § 1983 claims.  First, the Town argues that Mr. Mayfield—as a local health officer[7]—is an "arm of the State," and that a § 1983 claim cannot be maintained against the Town based on conduct attributable to the State of Vermont.  (*See* Doc. 57 at 4–8 (discussing *Stone v. Town of Middlebury*, No. 105-5-9 Ancv, 2010 WL 3302157 (Vt. Super. Ct. Apr. 7, 2010)).)  Second, the Town argues that Plaintiff has not raised any claim of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and that she has not offered any evidence of *Monell* liability.  (*See* Doc. 57 at 8–9.)  The court begins with the latter argument because, regardless of whether a local health officer is an arm of the State, *Monell* supplies the only basis for § 1983 liability against the Town.  *See Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort. . . . [A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").[8]

---

[7] Section 601 of Title 18 of the Vermont Statutes Annotated describes the appointment of local health officials.  Section 602a lists the duties of local health officers.

[8] *See also, e.g.*, *Brass v. County of Los Angeles*, 328 F.3d 1192, 1197 (9th Cir. 2003) ("[T]he only basis upon which a valid claim under § 1983 may be asserted against the County is under the 'policy or custom' theory of *Monell*."); *Kauffman v. Pa. Soc'y for the Prevention of Cruelty to Animals*, 766 F. Supp. 2d 555, 562 (E.D. Pa. 2011) (*Monell* supplies "the only basis

The complaint does not mention *Monell*. (*See* Doc. 1.) Nevertheless, because the complaint seeks to hold the Town liable for alleged constitutional violations under § 1983, Counts I and II as against the Town are *necessarily* claims under *Monell*. The court has therefore considered all of the parties' filings relating to *Monell*,[9] and proceeds to analyze whether the Town is entitled to summary judgment on the *Monell* claims.

As the *Monell* Court explained, a local government is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. Plaintiff asserts that her *Monell* claim against the Town should survive summary judgment "because the Town has a custom of not issuing health orders and instead relying on the Town Health Officer to issue emergency health orders that the Town then neglects." (Doc. 65 at 7.) The Town maintains that there are "multiple problems" with Plaintiff's theory. (Doc. 73 at 6.) Plaintiff disagrees, insisting that "the Town had a customary practice of not issuing health orders and also not reviewing or conducting hearings on Emergency Health Orders." (Doc. 81 at 3–4.)

Some background on Vermont law pertaining to health orders and EHOs is necessary here. The Vermont Commissioner of Health, the Commissioner's designee, or a town selectboard[10] "may issue a health order." 18 V.S.A. §§ 2, 126(a). "The issuing authority for a

---

for organizational liability under § 1983"); *Collins v. Village of Woodridge*, 96 F. Supp. 2d 744, 755 (N.D. Ill. 2000) (same).

[9] *See* Doc. 113 (granting motion for leave to file a sur-reply and denying motion to strike sur-reply).

[10] A selectboard has "general supervision of the affairs" of a town. 24 V.S.A. § 872(a). For purposes of Title 18, "selectboard" includes the trustees of an incorporated village or a city council. 18 V.S.A. § 2(11).

State health order shall be the Commissioner. The issuing authority for a local health order shall be the selectboard." *Id.* § 126(b). Before issuing such an order, "the issuing authority shall provide notice," including service of a "notice of intent, together with the supporting evidence, and a statement of procedural rights." *Id.* § 126(c). "Upon request of the person against whom the health order is sought, a hearing shall be held before the issuing authority." *Id.* § 126(c)(3). A health order is "effective upon issuance." *Id.* § 126(d).

The provisions of § 127 of Title 18 govern emergency health orders, which are distinct from health orders under § 126:

> (a) A health officer may, without a prior hearing, issue an emergency health order when necessary to prevent, remove, or destroy an imminent and substantial public health hazard or to mitigate an imminent and substantial significant public health risk. Such order may include any actions available under section 126 of this title. An emergency health order shall be effective upon actual notice to the person against whom the order is directed.

> (b) The health officer may issue an emergency health order only after preparation of a written statement of reasons stating the need for an emergency health order together with the supporting evidence and a statement of procedural rights available under this section. The order, together with the statement and the evidence, shall be made available as soon as possible to the person to whom the order is directed. An emergency order shall be served in person by a health officer or in accordance with the procedures set forth in Rule 4 of the Vermont Rules of Civil Procedure. . . .

> (c) A person to whom an emergency health order is directed shall be given the opportunity for a hearing within five business days after the issuance of such order. A person who is in full compliance with an emergency health order may request, and shall be granted, an extension of the hearing date. . . . If the emergency order was issued by a local health officer, such hearing shall be in front of the selectboard. At the hearing, the person to whom the order is directed shall be given the opportunity to rebut allegations upon which the emergency health order is based. After the hearing, the Commissioner or selectboard shall issue a health order pursuant to section 126 of this title affirming, modifying, or terminating the emergency health order.

18 V.S.A. § 127.[11]  With that background in mind, the court next considers the Town's

arguments for summary judgment on the *Monell* claims.[12]

### 1.    Failure to Train or Supervise

The Town suggests that Plaintiff's *Monell* claim is based on a failure to train or supervise

Mr. Mayfield that rises to the level of deliberate indifference.  (Doc. 73 at 4–5.)  The Town

asserts that this claim is not viable because the Town Selectboard is not the local health officer's

supervisor.  (*Id.* at 6.)  Plaintiff has clarified, however, that she is not asserting a failure-to-train

or failure-to-supervise claim.  (Doc. 81 at 3.)  It is therefore unnecessary to analyze any potential

supervisory relationship between the Selectboard and the local health officer.

### 2.    Selectboard's "Custom" of Relying on the THO to Issue EHOs

As noted above, Plaintiff maintains that the Town had a "custom of not issuing health

orders and instead relying on the Town Health Officer to issue emergency health orders that the

Town then neglects."  (Doc. 65 at 7.)[13]  The Town asserts that the Selectboard's failure to issue a

---

[11] Sections 126 and 127 of Title 18 were amended in 2023 after the events at issue in this case and after Plaintiff filed her complaint.  *See* 2023, No. 6, § 94, eff. July 1, 2023.  The amendments do not impact statutory provisions material to the issues here, and in any case have no effect on this suit under 1 V.S.A. § 213.

[12] The Town has not argued that the § 1983 due process claim might fail for lack of a federally protected entitlement to a state-mandated procedure.  *See Thayer v. Vt. Dep't of Children & Families*, No. 24-485-cv, 2025 WL 314787, at *3 (2d Cir. Jan. 28, 2025) (summary order) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures." (alteration in original; quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003))).  The court does not address that potential issue here, except to note that "state laws may in certain circumstances create a constitutionally protected entitlement," *Holcomb*, 337 F.3d at 224, and that the court previously ruled that Ms. Dean's allegations regarding lack of notice of her rights supported a plausible procedural due process violation (Doc. 17 at 9).

[13] Plaintiff also asserts in a footnote that the Selectboard "knew or should have known" that the EHOs Mr. Mayfield issued for the Jericho Street property lacked notice of appeal rights. (Doc. 81 at 3 n.3.)  The record indicates that Mr. Mayfield sent "weekly updates" to the Selectboard (Doc. 66-6 at 19) and that a note regarding the EHO for the Jericho Street property

health order cannot support Plaintiff's due process and seizure claims, which the Town maintains

both arise from the issuance of an EHO by the local health officer, not the Selectboard. (Doc. 73

at 7.) Plaintiff insists that she was deprived of post-deprivation remedies "[b]ecause the Town

failed to conduct either a hearing or selectboard meeting to determine if it was going to adopt the

EHO" and that the Selectboard had "a customary practice of . . . completely shirking its

responsibilities as the local board of health." (Doc. 81 at 3.)

    The court previously ruled that, as a tenant (rather than the property owner to whom the

EHO was "directed"), Ms. Dean was not entitled to a hearing on the EHO under 18 V.S.A.

§ 127(c). (Doc. 17 at 8.) In any case, it is undisputed that there was no request for a hearing on

the EHO under § 127. Plaintiff argues that, in such cases, 18 V.S.A. §§ 126 and 127 "obligate

the local board of health to adopt, amend, or vacate an EHO." (Doc. 81 at 4.)[14] Citing the Town

Health Officer Manual—a Vermont Department of Health publication dated March 2019—

Plaintiff asserts that the Town failed to comply with the instruction that "[i]f a hearing is not

requested, the THO needs to request this final order at the next Selectboard meeting." (Doc. 66-

---

appeared in an update that Mr. Mayfield emailed to the Selectboard on June 3, 2022 (Doc. 66-18
at 5). The record also indicates that EHOs are public records (Doc. 66-6 at 19), thus the
Selectboard could have accessed the EHOs for the Jericho Street property. (*See also* Doc. 91-29
at 2, ¶ 4 (Mr. Mayfield's admission that a copy of the EHO was available to the Selectboard).)
But apart from holding hearings on challenged EHOs under 18 V.S.A. § 127(c), nothing in the
statutory scheme requires selectboards to affirmatively review every EHO or otherwise perform
a quality control function for EHOs.

[14] Vermont law defines a "local board of health" as "the local health officer, with the
selectboard of the town or city council of a city." 18 V.S.A. § 2; *see also id.* § 604. Such boards
are empowered to "make and enforce rules . . . relating to the prevention, removal, or destruction
of public health hazards and the mitigation of public health risks, provided that such rules have
been approved by the Commissioner." *Id.* § 613(a). This case does not appear to involve any
challenge to such rulemaking, and while a local board of health is composed of the local entities
that issue health orders (the selectboard under 18 V.S.A. § 126) and emergency health orders (the
THO under 18 V.S.A. § 127), a local board of health does not itself issue such orders.

15 at 22.)[15] The Town maintains that its obligation was to follow Vermont state law, and that the Town Health Officer Manual does not have the force of law. (*See* Doc. 73 at 7 n.3.) According to the Town, "the only duty at law which a selectboard has in relation to an EHO is to address an appeal if one is requested, which did not occur here." (Doc. 73 at 8.)

Here, the evidence indicates that, in addition to the May 2022 EHO at issue in this case, Mr. Mayfield issued at least 12 EHOs between June 2020 and August 2022. (Doc. 66-26.) No objections were filed or hearings were requested as to any of those EHOs. (Doc. 66-5 at 87; Doc. 66-6 at 18; Doc. 66-25 at 5.) Instead, in Mr. Mayfield's experience, "[e]verybody's always gone for compliance" with the EHOs he issued. (Doc. 66-6 at 17.) The Selectboard did not issue any health orders under 18 V.S.A. § 126 at any time in the five years preceding the May 2022 EHO in this case. (Doc. 66-24 at 3.)

The court agrees with the Town that the Selectboard had no obligation to review or otherwise issue an order "affirming, modifying, or terminating" the EHO in this case. Where no hearing is requested on an EHO, nothing in the statutory scheme requires selectboard action. The court acknowledges the portion of the Town Health Officer Manual indicating that, where no hearing is requested on an EHO, "the THO needs to request . . . [a] final order at the next Selectboard meeting." (Doc. 66-15 at 22.) The court finds nothing prohibiting the THO from making a request that the selectboard issue a (regular) health order under 18 V.S.A. § 126. But nothing in the statutory text indicates that doing so is, as Plaintiff puts it, a required "final step of the EHO process." (Doc. 66 at 12.)

---

[15] The manual is available on the Vermont Department of Health website at: https://www.healthvermont.gov/sites/default/files/documents/pdf/Env_THO_THOManual.pdf [https://perma.cc/L6JX-XVQS].

If an EHO does not result in compliance, the Town Health Officer Manual indicates that the THO may elect to seek a health order under 18 V.S.A. § 126. (Doc. 66-15 at 25.) In addition, a selectboard could potentially seek civil enforcement of the THO. *See* 18 V.S.A. § 130(a) (civil enforcement of "orders issued pursuant to this title," presumably including EHOs). Otherwise, there is no statutory basis for selectboard involvement when no hearing is requested as to an EHO.

It is true that the evidence could support a conclusion that the Town's practice or custom was to initiate all action on potential public health risks and hazards at residential rental units exclusively via the EHO process in § 127. It is also true that nothing in the statutory scheme prohibited the Town from electing in those cases to proceed instead under the § 126 process, under which no order is issued until after a notice of intent is prepared and served. However, even accepting that the Town had a practice or custom of relying on the § 127 process, Vermont law expressly authorizes EHOs under that process. And there is no evidence that such "facially lawful" action caused Mr. Mayfield to engage in misconduct. *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405–07 (1997)). Mr. Mayfield did not include a statement of procedural rights on the EHO, but any practice or custom on the Town's part to rely on the EHO process for rental housing inspections did not cause that conduct. *See id.* (noting that a municipality cannot be held liable under § 1983 on a respondeat superior theory, and courts must ensure that an "indirect-causation theory [does] not result in the municipality's being 'held liable solely for the actions of its employee.'" (quoting *Brown*, 520 U.S. at 405)).[16]

---

[16] The court therefore agrees with the Town that Plaintiff "cannot establish the required element of causation," (Doc. 57 at 9 n.7), although for different reasons than those that the Town articulates.

It is not entirely clear whether Plaintiff's theory includes an argument that the Town could have enacted a policy to avoid or mitigate the potential for abuse of the EHO process. The court acknowledges the possibility that the Town could have done so.[17] But the alleged absence of a policy "is not a policy and is not actionable under *Monell*." *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *22 n.31 (S.D.N.Y. Mar. 19, 2024) (quoting *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014)). And the evidence in this case does not support a theory of a persistent or widespread "pattern of misconduct" suggesting the need for such a policy. *See id.* (quoting *Fraser v. City of New York*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021).

Based on the analysis above, the court concludes that the Town is entitled to summary judgment on Plaintiff's *Monell* claims. Even in the light most favorable to Plaintiff, there is no evidence of a Town policy or custom that resulted in the alleged deprivation of Plaintiff's rights under the Fourth Amendment (Count II) or under the Due Process Clause of the Fourteenth Amendment (Count I).

## B.    State-Law Claims Against the Town

### 1.    Claims Under Articles 4 and 11 of the Vermont Constitution

The Town's May 2024 memorandum in support of its summary judgment motion does not discuss the portions of Counts I and II that are brought under the Vermont Constitution. (*See* Doc. 57.) But the Town argues in its reply memorandum that monetary damages are not available for violations of Article 4 of the Vermont Constitution. (*See* Doc. 73 at 3 (citing *Flint*

---

[17] As possible examples, the Town could have required the Selectboard to review every EHO for which no hearing was requested. Or the Town could have required the use of the § 126 process instead of the EHO process in circumstances where the landlord requests a rental housing inspection.

*v. Vt. Dep't of Lab.*, No. 153-3-14 Wncv, 2016 WL 8078134 (Vt. Super. Ct. May 2, 2016)).)

Plaintiff asserts that *Flint* is distinguishable. (Doc. 81 at 1.) The briefing on the Town's motion

does not address Count II's unlawful-seizure claim under Article 11 of the Vermont Constitution.

Notably, the Vermont Supreme Court has held that "a private right of action seeking

money damages for violations of Article 11 is available directly under that constitutional

provision absent any adequate alternative legislatively enacted remedy." *Zullo v. State*, 2019 VT

1, ¶ 47, 209 Vt. 298, 205 A.3d 466. Therefore, even assuming that the Town's assertion that

money damages are unavailable under Article 4, that would not dispose of the Article 11 claim in

Count II.

The court concludes that it may be unnecessary to decide the question of remedies for

violations of Article 4. Instead, the court notes that Mr. Mayfield has argued in his motion that,

as relevant to the issues in this case, Articles 4 and 11 should both be interpreted in the same way

as the Due Process Clause and the Fourth Amendment. (Doc. 92 at 7.) If true, that would

suggest that the Town would be entitled to summary judgment on both the Article 4 and

Article 11 claims for the same reasons that it is entitled to summary judgment on the § 1983

claims. The court invites Plaintiff and the Town to brief that issue as it might relate to the

Vermont constitutional claims against the Town in Counts I and II. *See* Fed. R. Civ. P. 56(f).

Supplemental briefs on this issue shall not exceed 10 pages and shall be submitted with 30 days.

### 2.    Claim Under 18 V.S.A. § 122

Count III is a state-law claim for "violation of tenant rights" and seeks damages

under 18 V.S.A. § 122. (Doc. 1 at 5.) Plaintiff alleges that Defendants "issued an [EHO] and

immediately evicted Plaintiff without the requisite imminent health and safety risks," "failed to

provide Plaintiff with a health inspection report," and "failed to provide Plaintiff with

information about her rights to request a hearing or otherwise challenge the Emergency Health Order." (*Id.* ¶¶ 43–44.) The Town seeks summary judgment on Count III, arguing that: (1) Mr. Mayfield's actions as the LHO are attributable solely to the State of Vermont, and (2) the Town did not lock Plaintiff out of the premises, and it was the changed locks—not issuance of the EHO—that caused Plaintiff's injuries. (Doc. 57 at 10.) Plaintiff opposes both arguments. (Doc. 65 at 21.)

Section 122 of Title 18 creates a private right of action, stating: "Any person injured or damaged by a violation of this title, of a rule adopted pursuant to this title, or of a permit or order issued thereunder, or by a public health hazard may bring an action for equitable relief or damages arising from such violation or public health hazard." 18 V.S.A. § 122(a).[18] Plaintiff argues that the Town is liable for violations of Title 18 because, in her view, "the Town had an obligation pursuant to 18 V.S.A. § 127 and § 126 to conduct a hearing or hold a selectboard meeting and then 'issue a health order pursuant to section 126 of this title affirming, modifying, or terminating the emergency health order.'" (Doc. 65 at 21 (quoting 18 V.S.A. § 127).) For the reasons discussed above, the court concludes that the Town did not have those obligations. The Town is entitled to summary judgment on Count III.

## II.   Mr. Mayfield's Motion for Summary Judgment (Doc. 92)

Mr. Mayfield seeks summary judgment on all remaining claims against him,[19] arguing that: (1) he was at worst negligent—an insufficient basis for constitutional liability; (2) as

---

[18] Section 122 was amended in 2023 after the events at issue in this case and after Plaintiff filed her complaint. *See* 2023, No. 6, § 92, eff. July 1, 2023. The amendments were technical and do not impact statutory provisions material to the issues here, and in any case have no effect on this suit under 1 V.S.A. § 213.

[19] Plaintiff withdrew Count IV and the court previously dismissed Count III's § 122 claim against Mr. Mayfield. (*See* Doc. 17 at 18.)

relevant here, Articles 4 and 11 are interpreted the same way as the Due Process Clause and the Fourth Amendment; and (3) Mr. Mayfield is entitled to qualified immunity. (Doc. 92.) Plaintiff seeks denial of Mr. Mayfield's motion as untimely. (Doc. 105 at 1.) She also opposes each of Mr. Mayfield's arguments on their merits. (*Id.* at 4–14.) The court begins with the procedural issue.

### A.    Timeliness of the Motion

Mr. Mayfield concedes that he filed his summary judgment motion three days after the November 1, 2024, deadline for such motions imposed under the amended Discovery Schedule/Order (Doc. 53) and a subsequent extension of time (Doc. 89). He asks the court to consider the motion because denial on procedural grounds could waste judicial resources and because any prejudice to Plaintiff is minimal. (Doc. 112 at 1–2.) The court construes that request as seeking application of the "good cause" standards in Fed. R. Civ. P. 6(b)(1)(B) and 16(b)(4) and the "excusable neglect" standard of Rule 6(b)(1)(B). The circumstances here— evaluated under the factors articulated in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993)— weigh in favor of considering the untimely summary judgment motion in this case.

Plaintiff asserts that the late filing prejudices her because the deadline for motions was the same for all parties and thus "Defendant had the benefit of Plaintiff's motion [Doc. 91] to better craft his arguments." (Doc. 105 at 2.) But counsel for Mr. Mayfield has represented to the court that he did not read Plaintiff's motion while preparing Mr. Mayfield's motion. (Doc. 112 at 2.) Even if defense counsel had read Plaintiff's motion, the court's review of that motion and Mr. Mayfield's motion does not indicate any great strategic advantage gained in preparing the defense motion. Plaintiff also asserts that counsel for Mr. Mayfield had more time to prepare his

filing. (Doc. 105 at 2.) That is not disputed, but the amount of additional time was limited to three days. The strategic advantage was minimal and the impact on judicial proceedings was negligible. Defense counsel explained the reason for the delay: he was ill "and unwisely decided to simply press on with finishing the motion and filing it rather than spending time coordinating an extremely brief enlargement with the parties and Court." (Doc. 112 at 2.) The court agrees the better practice would have been to seek an enlargement of time. At the same time, the court finds no basis to conclude that defense counsel acted in bad faith. For the reasons stated above, the court elects to consider Mr. Mayfield's untimely motion in this case. The court cautions Mr. Mayfield's counsel to take care in the future to confer with opposing counsel and seek extensions before deadlines come due.

### B.    Mental State; Negligence

"Section 1983 does not include a state-of-mind requirement." *Wiggins v. Griffin*, 86 F.4th 987, 997 (2d Cir. 2023) (per curiam) (citing *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986)). "Instead, this requirement is defined by the underlying constitutional right at stake." *Id.* Plaintiff does not take issue with the proposition that a plaintiff claiming violations of her right to procedural due process and to the Fourth Amendment's prohibition against unreasonable seizures must prove more than negligence.[20] She argues instead that the evidence shows that Mr.

---

[20] *See, e.g.*, *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (per curiam) ("Merely negligent conduct does not give rise to claims under the Fourteenth Amendment."); *Wantanabe Realty Corp. v. City of New York*, 159 F. App'x 235, 237 (2d Cir. 2005) (summary order) ("In order to show a violation of procedural due process rights, a plaintiff must show an intent more culpable than mere negligence."); *Dodd v. City of Norwich*, 827 F.2d 1, 7–8 (2d Cir. 1987) (holding that the Fourth Amendment "only protects individuals against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner"); *Griffith v. Hofmann*, No. 05 CV 126, 2008 WL 4682690, at *4 (D. Vt. Oct. 21, 2008) ("Allegations of negligence or innocent mistake are insufficient [for a claim under the Fourth Amendment]." (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978))).

Mayfield acted deliberately and intentionally. (*See* Doc. 105 at 4–9.) Mr. Mayfield asserts that Plaintiff has conceded that he did not have a culpable mental state. (Doc. 112 at 3.)

As to the question of a concession, it is true that Plaintiff did not object to the following assertion in Mr. Mayfield's Rule 56 statement: "Mr. Mayfield thought the emergency health order included a statement of procedural rights, and first learned the May 2022 emergency health order did not include a statement of procedural rights after the instant lawsuit was filed." (Doc. 92-2 ¶ 93.) The lack of objection to that assertion might be sufficient to conclude that Mr. Mayfield did not *intentionally* omit the statement of procedural rights. But it does not necessarily preclude the possibility of a less culpable, but still actionable, mental state. The following additional facts are relevant to the issue of Mr. Mayfield's mental state.

### 1.    Additional Facts

Consistent with the summary judgment standard, the court reviews the evidence in the light most favorable to Plaintiff. After Mr. Patterson's death in April 2022, the 102 Jericho Street property went to his estate, which was administered by his stepson, Anthony Swett. (Doc. 92-2 ¶ 40;[21] Doc. 92-7 at 11.) Anthony Swett's brother Michael Swett was not an administrator of the estate, but he knew the estate existed and that the Jericho Street property was part of the estate. (Doc. 66-16 at 4.) Michael Swett testified that, at some point on May 26 or May 27, 2022, he called Mr. Mayfield to schedule an inspection of the property. (Doc. 66-16 at 9.) His goal in scheduling the inspection was "[t]o get them people out of my parents' house

---

[21] As noted above, Plaintiff's opposition to Mr. Mayfield's Rule 56 statement is divided into two sections: one listing factual assertions that Plaintiff asserts are immaterial, and one listing factual assertions that Plaintiff contends are disputed or misleading. (Doc. 105-1 at 1, 13.) Unless otherwise noted, neither section includes objections to the facts set forth below.

that didn't belong there." (*Id.*) In the phone call, Michael Swett told Mr. Mayfield: "I had some

people at my parents' house, and they didn't belong there." (*Id.*)

On the morning of May 27, 2022, Michael Swett's wife, Lisa Swett, texted Mr. Mayfield

and advised:

> Hi Brett, the address is 102 Jericho Street, owned by the Estate of John Patterson.
> Todd Steadman is handling the estate administration. According to my sister in
> law, he is seeking an emergency appointment of executorship so he can begin the
> eviction process. The "tenant" is Jennifer Dean and her guest is Ronnie Charbono.
> Ronnie is the individual that was still high on meth yesterday afternoon and was
> causing the neighbors concern with her erratic behavior. As I mentioned, when my
> husband went there, she was naked in the swimming pool. . . . My husband Michael
> will gladly meet you there if you let me know what time. He has a key to the
> residence.

(Doc. 91-20.)[22] Michael Swett met Mr. Mayfield at the property and was present during Mr.

Mayfield's inspection that afternoon. (Doc. 66-16 at 8.) As noted above, Ms. Dean was not

present during the inspection. (Doc. 92-2 ¶ 45.)

It is undisputed that Mr. Mayfield did not tell the Swetts to change the locks on the

Jericho Street property. (Doc. 92-2 ¶ 73.) In the evening, after the inspection, the Swetts

changed the locks. (Doc. 66-16 at 13.) Lisa Swett texted Mr. Mayfield the following day and

advised that "yesterday went fine at 102 Jericho street" and that she thought Ms. Dean was

"staying at the super 8 motel now." (Doc. 91-20 at 4.)

As noted above, the EHO that Mr. Mayfield issued on May 27, 2022, did not contain any

narrative regarding Ms. Dean's (or anyone's) rights to challenge, request a hearing, or appeal the

---

[22] Mr. Mayfield asserts that Plaintiff failed to cite any evidence that he actually received
or read this text message. (Doc. 112-1 ¶ 51.) The court can infer, however, that Mr. Mayfield
did read the text message, particularly because the record indicates that Lisa Swett texted Mr.
Mayfield again at 1:00 p.m. on May 27 to "mak[e] sure you received the address as my text
ended up being a bit long" and Mr. Mayfield replied, "Yes we are going there now." (Doc. 91-
20 at 3.)

EHO; it also did not contain a narrative about Ms. Dean's rights as a tenant or the property owner's duties to her.  (*See* Doc. 1 ¶ 28; Doc. 18 ¶ 28; Doc. 27 ¶ 28.)  The subsequent EHOs noting re-inspection of the pool on June 23, 2022, and another re-inspection on July 28, 2022, also lacked such statements.  (Docs. 66-28, 66-29.)  It is undisputed that, except for the EHOs for the Jericho Street property, all the other EHOs that Mr. Mayfield issued included a paragraph describing procedural rights.  (Doc. 66-5 at 118; Doc. 112-1 ¶ 26.)[23]  He testified that the EHOs for the Jericho Street property lacked that paragraph because "I cut and paste[d] the wrong—the wrong bottom part of the form."  (Doc. 66-5 at 119.)  Mr. Mayfield testified that he did not realize that omission until after this lawsuit was filed.  (*Id.*)

Mr. Mayfield testified that he had "extensive verbal" communication with Ms. Dean "[t]hroughout the weekend" after he issued the EHO.  (Doc. 66-5 at 128.)  He testified that he told her "what she needed to do if she needed a hearing" and that "she should get ahold of an attorney as soon as possible."  (*Id.*)  Ms. Dean recalled talking to Mr. Mayfield on May 27, 2022, and again "that week or the following week."  (Doc. 105-2 at 17.)  In contrast to Mr. Mayfield's testimony about what they discussed, Ms. Dean testified that, during the second conversation, she did not ask if it was possible to appeal the EHO because she "didn't know nothing about it"; and she did not recall Mr. Mayfield mentioning anything about the possibility of an appeal.  (*Id.* at 19.)

---

[23] *See also* Doc. 66-26 at 1–18 (copies of other EHOs, each with a paragraph stating: "The persons subject to this Emergency Health Order shall notify the Health Officer within five business days from the date of this order, may request a hearing in front of the Hartford Health Board.  However the order is in effect as of the date of the order.").  One document dated July 15, 2022 is entitled "Health Officer Inspection" (not "Emergency Health Order"); it does not include the statement of procedural rights.  (*Id.* at 13.)

Represented by Legal Aid, Ms. Dean sued the beneficiaries of Mr. Patterson's estate in Vermont state court on July 6, 2022, for illegal eviction, breach of covenant of quiet enjoyment, intentional infliction of emotional distress, and consumer fraud. (Doc. 92-2 ¶ 88.) The parties to that suit settled on August 3, 2022. (*See* Doc. 92-15.)

At the re-inspection of the Jericho Street property on July 28, 2022, Mr. Mayfield observed that multiple issues had not been remedied. (Doc. 66-6 at 106.) Mr. Mayfield testified that the Swetts did not explain why those issues had not been fixed "except that they were moving forward selling the house." (*Id.* at 107.) Mr. Mayfield told the Swetts that "the issues traveled with the house" and that the issues would have to be addressed "before it could be occupied as a rental unit." (*Id.*) At some point Mr. Mayfield received word that the next owner was using the Jericho Street property as a single-family dwelling; at that point Mr. Mayfield concluded that he "had no more jurisdiction." (*Id.* at 106, 146.) The Town Health Officer Manual states that THOs "may impose a fine of up to $100 per day for each violation that is not corrected by the date set in the inspection report, or if the unit is re-rented to a new tenant before the violations have been corrected." (Doc. 66-15 at 25.) Mr. Mayfield never imposed a fine for noncompliance with the EHO. (Doc. 92-2 ¶ 25.)

### 2.    Insufficient Undisputed Material Facts as to Mental State

Plaintiff contends that the evidence supports a conclusion that Mr. Mayfield was more than negligent because:

- Mr. Mayfield knew from his phone call with Michael Swett before the inspection that Mr. Swett believed the people in the house "don't belong there"; Mr. Mayfield also knew from the text message from Lisa Swett that the estate intended to begin the eviction process.

21

- It was "out of character" for Mr. Mayfield to omit a statement of procedural rights in
  an EHO, and "even more shocking" that he omitted the statement in the two
  subsequent EHOs documenting re-inspections on June 23 and July 28.

- The EHO was directed only to the estate with Lisa Swett's email address.

- The situation was not an "emergency"; a woman was swimming in the "polluted"
  pool on the day before the EHO and, in Plaintiff's view, the issues with the basement
  were "easily fixable." Instead of issuing an EHO, Mr. Mayfield could have issued a
  "notice of intent" to seek a health order under § 126(c)(1).

- Mr. Mayfield knew that the EHO had the effect of removing Ms. Dean from the
  home.

- The EHO did not list any deadlines or threaten any fines for noncompliance, and Mr.
  Mayfield took no "corrective action" in the following months to provide Ms. Dean
  with due process rights.

(*See* Doc. 105 at 4–9.)

Notably, "courts are generally reluctant to dispose of a case on summary judgment when
mental state is at issue." *Cameron v. Menard*, No. 18-cv-204, 2024 WL 5165447, at *11 (D. Vt.
Dec. 19, 2024) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995)). But "it is
permissible to do so where there are sufficient undisputed material facts on the record." *Id.*
(quoting *Lipton*, 71 F.3d at 472). For the reasons below, the court concludes that there are
insufficient undisputed material facts for the court to dispose of the § 1983 claims against Mr.
Mayfield on summary judgment.

Mr. Mayfield's knowledge that the Swetts believed Ms. Dean did not "belong" at the
Jericho Street property and that they intended to evict her is one element of evidence that might

support a conclusion that Mr. Mayfield issued the EHO with a culpable mental state designed to "help[] [the Swetts] obtain their desired outcome." (Doc. 105-1 at 25.) Although the Town Health Officer Manual advises to avoid landlord-tenant conflicts (Doc. 66-15 at 35), a THO conducting a landlord-requested rental inspection with knowledge that the landlord is seeking to evict the tenant may be drawn into the conflict. A jury could conclude that the Swetts summoned Mr. Mayfield for the purpose of eviction, and that Mr. Mayfield acted without recognizing the potential conflict and without sufficiently respecting the tenant's rights and interests.

The court agrees that the evidence indicates that Mr. Mayfield's failure to include the written statement of procedural rights on the EHOs for the Jericho Street property was unusual. The record shows that Mr. Mayfield issued numerous EHOs for other properties before and after the EHOs for the Jericho Street property, all of which included a statement of procedural rights. This error—even perpetuated in the two subsequent EHOs for the Jericho Street property—is arguably consistent with negligence. But it is also arguably consistent with a more culpable mental state.

Lisa Swett's email to Mr. Mayfield on the morning of May 27 indicated that Jennifer Dean was a "tenant" at the Jericho Street property. Mr. Mayfield did not include Ms. Dean's name on the first EHO that he issued that afternoon; only the EHOs from June and July listed Ms. Dean as an "[o]ccupant[]" at the property. (Doc. 66-28 at 1; Doc. 66-29 at 1.) And none of the three EHOs were addressed to anyone other than the "Estate of John Patterson," with Lisa Swett's email address. Plaintiff asserts that failure to address the EHOs to Ms. Dean "may have prevented Plaintiff from requesting a hearing with the selectboard" because she "would have had a clear right to a hearing" if the EHO was directed to her. (Doc. 105 at 8.)

Numerous other EHOs that Mr. Mayfield issued were directed only to a landlord, even when the EHO identified a tenant as occupying the premises. (*See* Doc. 66-26.) Plaintiff has not cited any authority suggesting that this practice conflicts with any statute, regulation, or guidance. Nor is it surprising, given that landlords are obligated to maintain the habitability of a premises, and lost rent generally creates financial incentive to resolve issues identified in an EHO. Indeed, the Town Health Officer Manual presumes that the *landlord* will "make the corrections" to resolve an EHO. (Doc. 66-15 at 25.) On the other hand, when the request for a rental housing inspection comes from a landlord, there is arguably more cause to ensure that any resulting EHO is directed to both the landlord and the tenant.

Moreover, Mr. Mayfield's EHO for the Jericho Street property granted only two hours to vacate the unit. A factfinder could conclude that Mr. Mayfield overlooked reasonable alternatives, such as a 24- or 48-hour period to remedy the life safety issues. A factfinder could also conclude that most of the issues could have been addressed within that time. It would have taken more time to resolve the lack of a second egress from the basement living space. But Mr. Mayfield himself stated that "the windows in bedrooms not being in conformity with fire safety codes would not, in itself, be a reason to issue an emergency health order that prohibited occupancy." (Doc. 91-29, at 3 ¶ 15.)

As to whether the circumstances at the time of Mr. Mayfield's first inspection of the Jericho Street property constituted an "emergency," § 127 of Title 18 indicates that an EHO may issue "when necessary to prevent, remove, or destroy an imminent and substantial public health hazard or to mitigate an imminent and substantial significant public health risk." A "public health hazard" is defined as "the potential harm to the public health by virtue of any condition or

any biological, chemical, or physical agent." 18 V.S.A. § 2(9).[24]  A "public health risk' means "the probability of experiencing a public health hazard," and a "significant public health risk" means "a public health risk of such magnitude that the Commissioner or a local health officer has reason to believe that it must be mitigated." *Id.* § 2(10), (12).

Here, Plaintiff contends that the condition of the pool at the property did not constitute an emergency because of the evidence that someone was swimming in the pool the day before the inspection. (Doc. 105 at 8.)  She further asserts that "[e]ven if the pool was polluted, removing the tenant was unrelated." (*Id.* at 9.)  It appears that the concern about the pool related to whether it was a source of mosquitos that might cause infections at the nearby school, not whether it was unsafe to swim in the pool.  In any event, regardless of whether the state of the pool constituted an emergency, the court agrees that the issues with the pool alone would not be a basis to declare an otherwise safe dwelling uninhabitable.

The undisputed facts do support the conclusion that health authorities needed to take some action regarding the conditions at the Jericho Street residence.  Even crediting Ms. Dean's testimony that there was a smoke alarm in her room and the evidence that there was a handrail for the basement stairs, there is no dispute that the basement had only a single egress, there were walls that were open to the outside, and there were exposed electrical wires in the basement.  Courts have found similar deficiencies in rental properties to constitute public health hazards or risks. *Cf. Town of Colchester v. Sisters & Brothers Inv. Grp. LLP*, No. 2020-203, 2021 WL 1345737, at *1 (Vt. Feb. 4, 2021) (mem.) (noting that the trial court found "significant public-health violations" at residential rental properties due to, among other things, risk of electrocution

---

[24] The statute provides a non-exclusive list of six factors for consideration when determining whether a health hazard is public or private. *Id.* § 2(9)(A)–(F).

and rodents entering the buildings).[25]  However, a factfinder reviewing all the circumstances here could conclude that the terms of the EHO that Mr. Mayfield issued support a mental state more culpable than negligence.  Indeed, regarding the effect of the EHO, Mr. Mayfield admitted that the EHO "prohibited occupancy of the entire property by rental tenants."  (Doc. 91-29 at 2, ¶ 7.)

Finally, Plaintiff notes that the EHO did not list a deadline for compliance or threaten fines for failure to comply, and she asserts that Mr. Mayfield "took no corrective action in the months that followed to provide due process rights to Plaintiff."  (Doc. 105 at 5.)  There appears to be a dispute about the extent to which Mr. Mayfield verbally advised Ms. Dean of her rights or options after issuing the EHO.  The absence of specific deadlines for compliance with the identified issues (aside from the two-hour deadline for remediating the pool) could be further evidence that the EHO was designed to be more favorable to the landlords.[26]  Based on all of the above, the court concludes that, in the light most favorable to Plaintiff, there are insufficient undisputed material facts to conclude on summary judgment that Mr. Mayfield's mental state was no more culpable than negligence.

---

[25] The Vermont Supreme Court did not decide whether the defects were "public" health hazards as defined in 18 V.S.A. § 2(9) because the landlord failed to preserve that argument on appeal.

[26] The EHO did not itself threaten fines, but the rental housing inspection report included a "notice to property owner" stating that: "Until the violations described in this report are corrected, you are prohibited from renting the affected unit(s) to new tenants," and that "A fine of up to $100 per day may be imposed for each violation not corrected by the deadline provided in this report or if an affected unit is rented to a new tenant before the violation(s) are corrected." (Doc. 57-4 at 14.)  The absence of deadlines for most of the identified issues and the Swetts' intent not to rent the property to any other tenants suggests that these potential consequences would not have motivated the Swetts to repair the issues.

**C.    Qualified Immunity**

Mr. Mayfield asserts that he is entitled to qualified immunity on each of Plaintiff's claims, arguing that, as compared to the court's ruling at the Rule 12(b)(6) stage (Doc. 17), discovery has "generally worsened Plaintiff's argument against qualified immunity." (Doc. 92 at 10.) Ms. Dean disagrees, arguing that discovery has weakened Mr. Mayfield's qualified immunity arguments. (Doc. 105 at 11.) Mr. Mayfield insists that he is entitled to qualified immunity under the first step of the applicable analysis. (Doc. 112 at 5.)

The court discussed the doctrine of qualified immunity in its prior ruling at the Rule 12(b)(6) stage. (*See* Doc. 17.) "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether a government official is entitled to qualified immunity involves a two-step analysis: (1) whether the officer's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the challenged conduct. *Pearson*, 555 U.S. at 232; *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022). The court has discretion to decide which of those two prongs to address first "in light of the circumstances in the particular case at hand." *Radwan v. Manuel*, 55 F.4th 101, 113–14 (2d Cir. 2022) (quoting *Pearson*, 555 U.S. at 236).

### 1.    Step One: Violation of a Constitutional Right

Here, the court agrees with Mr. Mayfield insofar as he asserts that he can present evidence supporting the conclusion that his most culpable mental state at any relevant time was negligence with respect to omitting the statement of procedural rights from the EHO. (*See* Doc. 92 at 10 (citing evidence).) But, for the reasons discussed above, the court concludes

that there is also sufficient evidence to support a conclusion that Mr. Mayfield had a more culpable mental state. The summary judgment procedure prohibits weighing Mr. Mayfield's evidence against Ms. Dean's and prohibits making credibility determinations. *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). For this reason, the court cannot rule at this stage that Mr. Mayfield was simply negligent; the court therefore rejects his contention that he is entitled to qualified immunity under the first step of the analysis.

### 2.    Step Two: Clearly Established

Regarding step two of the qualified immunity analysis, Mr. Mayfield argues that "in May 2022, there was no clearly established law indicating that it was unreasonable to revoke occupancy under these circumstances." (Doc. 92 at 6, 11.) Citing the court's September 2023 Order at the Rule 12(b)(6) stage (Doc. 17), Plaintiff maintains that "it was clearly established at the time that Defendant was required to provide notice to Plaintiff of her procedural rights." (Doc. 105 at 11, 13.) In that prior ruling, the court noted that Ms. Dean had not cited authority indicating that she was entitled to a pre-deprivation hearing, but also ruled that her right to notice of post-deprivation remedial procedures was clearly established. (Doc. 17 at 11–12.)

The court adheres to its prior ruling that Ms. Dean had that clearly established right. But that right is defined at a high level of generality. *See Soukaneh v. Andrzejewski*, 112 F.4th 107, 123 (2d Cir. 2024) ("[C]learly established law should not be defined at a high level of generality for purposes of qualified immunity analysis." (quoting *Collymore v. Krystal Myers, RN*, 74 F.4th 22, 29 (2d Cir. 2023)). Whether the absence of written notice on the EHO can support either of the § 1983 claims against Mr. Mayfield in this case depends on a determination about his mental state that the court cannot make at this stage of the case.

The court rejects Mr. Mayfield's contention that he should prevail at step two of the analysis due to an absence of caselaw indicating "that a rental tenant under these circumstances has a clearly established right for the property to not be subject to an emergency health order." (Doc. 92 at 11.)  But, in the court's view, Mr. Mayfield's articulation frames the purported "right" too narrowly.  Moreover, the qualified immunity analysis does not "'demand [the] specificity' of a factual twin" to the case at issue. *Soukaneh*, 112 F.4th at 123 (alteration in original; quoting *Collymore*, 74 F.4th at 30).  The court accordingly concludes that Mr. Mayfield has not met his burden on the qualified immunity defense at this stage of the case, and that he is not entitled to summary judgment on the § 1983 claims in Counts I and II.

### D.    Claims Against Mr. Mayfield Under Articles 4 and 11

Mr. Mayfield argues that Articles 4 and 11 should be interpreted the same way as the Due Process Clause and the Fourth Amendment in this case, and that he is entitled to summary judgment on those state-law claims for the same reasons as on the § 1983 claims against him. (Doc. 92 at 7.)  Plaintiff maintains that her analysis of the § 1983 claims is correct, and that Mr. Mayfield's motion should be denied on the Vermont constitutional claims even if the applicable standards are the same under both constitutions.  (Doc. 105 at 9.)

The court agrees with Plaintiff on this point.  The relevant Vermont constitutional provisions are at least as protective as the analogous federal provisions.  And Mr. Mayfield concedes that Vermont has adopted the federal qualified immunity standard.  (Doc. 92 at 9.) Based on the analysis above regarding the § 1983 claims against Mr. Mayfield, the court concludes that the claims under Articles 4 and 11 also survive.  This conclusion makes it unnecessary to address Plaintiff's additional argument that Articles 4 and 11 both provide greater protections than their federal analogues.  (Doc. 105 at 9.)

### III.    Plaintiff's Motion for Partial Summary Judgment (Doc. 91)

In her Rule 56 motion, Plaintiff seeks partial summary judgment on Count I. She asserts that it is "undisputed that she was not provided notice of her due process rights before or after being deprived of her home." (Doc. 91 at 1.) And she asserts that "the only question in this case is whether she was provided with sufficient post-deprivation notice and process." (*Id.* at 7.)

As discussed above, it is undisputed that the EHOs for the Jericho Street property did not include a written statement of procedural rights. However, there is a dispute as to what verbal notice Mr. Mayfield might have given Ms. Dean after issuing the May 2022 EHO. And even if Mr. Mayfield did not provide Ms. Dean with sufficient post-deprivation notice and process, he would still not be liable unless he had a sufficiently culpable mental state. For the same reasons that the court cannot decide Mr. Mayfield's mental state to grant summary judgment in his favor, the court also cannot do so to grant summary judgment in favor of Ms. Dean.

### Conclusion

The Town of Hartford's Motion for Summary Judgment (Doc. 57) is GRANTED as to the federal claims in Counts I and II and as to the state-law claims in Count III. The court RESERVES ruling on the state-law claims against the Town in Counts I and II pending further briefing. Supplemental briefs on this issue shall not exceed 10 pages and shall be submitted with 30 days.

Brett Mayfield's Motion for Summary Judgment (Doc. 92) is DENIED.

Plaintiff's Motion for Partial Summary Judgment (Doc. 91) is DENIED.

Dated at Burlington, in the District of Vermont, this 31st day of March, 2025.

/s/ Geoffrey W. Crawford
District Judge
United States District Court